IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 3, 2018

## STATE OF TENNESSEE v. DEQUEVION LAMAR LEE

**Appeal from the Circuit Court for Madison County**
**No. 14-522 Kyle Atkins, Judge**

_____

### No. W2017-01449-CCA-R3-CD

_____

The defendant, Dequevion Lamar Lee, was convicted by a Madison County jury for attempted first-degree murder and aggravated assault. On appeal, he argues the evidence is insufficient to sustain his convictions. Upon review, we affirm the judgments of the trial court but remand the case for entry of a corrected judgment form as to count two reflecting the defendant's aggravated assault conviction was merged with count one.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**
**and Remanded for Entry of Corrected Judgment**

J. ROSS DYER, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR. and ROBERT L. HOLLOWAY, JR., JJ., joined.

Joseph Taggart, Jackson, Tennessee, for the appellant, DeQuevion Lamar Lee.

Herbert H. Slatery III, Attorney General and Reporter; Garret D. Ward, Assistant Attorney General; Jody Pickens, District Attorney General; and Ben Mayo, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### *Facts and Procedural History*

A Madison County grand jury indicted the defendant and his co-defendant, Moriarco Montrell Lee, with one count of attempted first degree murder and one count of aggravated assault involving the use of a deadly weapon. These indictments arose out of a shooting that occurred on December 10, 2013, at 359 Lane Ave in Jackson, Tennessee, next to the Tight Cuts Barbershop ("barbershop"). The defendant and co-defendant arrived at the barbershop and shot the victim, Marketus Hendrix, several times before fleeing. The victim survived the shooting and later identified both men as his attackers.

The victim testified that, on December 10, 2013, around 3:00 p.m., he drove to the barbershop. As he exited his car, a person the victim knew only as "Yogi" said "B\*\*ch, you're about to die," and two people began shooting at him. The shooters were not wearing masks, and the defendant later stated he immediately recognized them as "Yogi" and "D-Rich." The victim was not able to verbally identify both men until later at the hospital and was only able to provide their street names. Later, based on police investigation, "Yogi" and "D-Rich" were identified as the co-defendant and defendant respectively.

At the time of the shooting, the co-defendant was standing "[n]ot too far from where [the victim] parked," near the stairs of the barbershop. The second shooter, the defendant, was standing behind the barbershop to the left, in front of where the victim parked. The victim was shot a total of fourteen times, sustaining wounds to the chest, abdomen, arm, and leg, and was in the hospital for twenty-one days.

About a week after the shooting and while still in the hospital, the victim was interviewed by and gave a written statement to Investigator Alberto Colon. In his statement, the victim identified his assailants as "Yogi" and "D-Rich." He also told officers that a person known as "Baldy" was driving the white Honda in which the defendant and co-defendant fled. The victim acknowledged he knew "Baldy" and had a sexual relationship with "Baldy's" girlfriend, Megan, while "Baldy" was in jail. The victim recognized the white Honda as Megan's vehicle. Though marijuana was found on the victim's person by an officer who responded to the scene, the victim stated the marijuana was for personal use only. The victim acknowledged the defendant was his cousin, but he was unaware of this prior to the shooting. The victim was also unaware of any motivation the defendant might have for shooting him and denied there had been any problems between them in the past. The victim also testified he visited the barbershop earlier that day and had seen "Baldy" there.

Jackson Police Department ("JPD") Officer James Jay Carter responded to a shots fired call on December 10, 2013. Officer Carter was advised by dispatch "that they had seen several subjects getting into a white-colored vehicle and leaving eastbound on . . . Lane Avenue." When Officer Carter arrived, he found the victim lying on the ground with multiple gunshot wounds to his chest. Officer Carter was able to communicate with the victim by getting him to nod and shake his head in response to questions. The victim indicated there were four men in a white Honda and he recognized both shooters. Officer Carter checked the victim's pockets and found four small bags of marijuana. The victim was transported to the hospital shortly thereafter.

JPD Investigator Marvin Rodish inspected the crime scene the same day. Investigator Rodish recovered ten shell casings from the scene and two bullets, one of which had traces of blood on it. He conceded there was no way to know how long the shell casings and bullets had been on the scene.

JPD Investigator Alberto Colon testified he was a sergeant in the Violent Crimes Unit when he led the investigation in this case. When Investigator Colon interviewed the victim in the hospital, the victim provided him with the "street" names of the shooters, "Yogi" and "D-Rich." Investigator Colon recalled the victim did not hesitate or appear confused or doubtful about the identification. Based on the street names and sources within a gang unit, Investigator Colon identified the suspects and put together two photographic lineups for the victim to view. Upon viewing the photo spreads, the victim identified the defendant and co-defendant as the shooters.

Investigator Colon interviewed the victim again before the preliminary hearing, and the victim told him where the second shooter had been standing. Consequentially, Investigator Colon returned to the scene and found four additional .9 millimeter shell casings on the ground where the victim said the second shooter had been standing. The discovery of the additional shell casings occurred about a month after the shooting. Another bullet was also recovered from the victim's body at the hospital and collected as evidence.

On cross-examination, Investigator Colon confirmed none of the shell casings were sent for fingerprint analysis and the guns used in the shooting were never located. Investigator Colon also acknowledged he spoke with several witnesses at the scene but none of the witnesses gave any valid or useful information. Investigator Colon confirmed the victim mentioned an individual named "Baldy" in his statement and that Investigator Colon identified and interviewed "Baldy." On redirect, Investigator Colon confirmed the victim never identified anyone other than the defendant and co-defendant as the shooters. Investigator Colon also stated the victim identified the defendant as "D-Rich."

Kasia Michaud, a Special Agent Forensic Scientist employed by the Tennessee Bureau of Investigation and assigned to the Firearms Identification Unit, examined the shell casings and bullets in this case which included ten .40 caliber shell casings, three bullets, and four .9 millimeter shell casings. Agent Michaud determined two guns were used in the shooting by comparing the rifling on the casings. The ten .40 caliber shell casings were all fired from the same weapon, and the four .9 millimeter shell casings were fired from another. While Agent Michaud determined the three recovered bullets came from the same gun, she could not confirm the bullets came from any of the shell casings found on the scene. On cross-examination, Agent Michaud confirmed she could

not tell how long the shell casings or bullets had been on the ground or if they had been fired at the same time.

The jury then heard testimony from Lashonda Lee, the defendant's mother. Ms. Lee testified that on December 10 the defendant and co-defendant were in Madison, Tennessee, helping her move furniture. However, Ms. Lee conceded they were not with her the entire time. She stated if the defendant and co-defendant were not at her house, they were at her daughter's house watching her grandson. Ms. Lee admitted that on December 10, she was not present at her daughter's house when both men were allegedly there.

After deliberation, the jury returned a verdict of guilty as to both counts. At the sentencing hearing on July 6, 2015, the trial court merged the aggravated assault conviction into the attempted first-degree murder conviction and sentenced the defendant as a Range I, Standard Offender to twenty-two years in the Tennessee Department of Correction. The defendant filed a motion for new trial on July 7, 2015, and a hearing was held on June 21, 2016, at which the trial court denied relief. This timely appeal follows.

*Analysis*

The defendant argues the evidence is insufficient to support the jury's verdict because the State provided no evidence of a motive for the shooting and his alibi witness went uncontested. When the sufficiency of the evidence is challenged, the relevant question for the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be

given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *Dorantes*, 331 S.W.3d at 379 (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). This Court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id.*

A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense, "[a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" Tenn. Code Ann. § 39-12-101(a)(2). First-degree murder is the premeditated and intentional killing of another person. *Id.* § 39-13-202(a)(1). Premeditation is defined as "an act done after the exercise of reflection and judgment." *Id.* § 39-13-202(d). Premeditation requires a finding that "the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." *Id.* The statute also specifies that "[t]he mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." *Id.*

The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006) (citing *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997)); *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000). Factors that may support the existence of premeditation include, but are not limited to: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, the infliction of multiple wounds, declarations by the defendant of an intent to kill, lack of provocation by the victim, failure to aid or assist the victim, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, calmness immediately after the killing, and destruction and secretion of evidence of the killing. *State v. Kiser*, 284 S.W.3d 227, 268 (Tenn. 2009); *State v. Leach*, 148 S.W.3d 42, 53-54 (Tenn. 2004); *State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003); *Bland*, 958 S.W.2d at 660.

Furthermore, an assault occurs when one "[i]ntentionally, knowingly, or recklessly causes bodily injury to another[.]" Tenn. Code Ann. § 39-13-101(a)(1). An assault becomes aggravated when one uses or displays a deadly weapon. Tenn. Code Ann. § 39-13-102(a)(1)(A)(i). It is undisputed the assailants used deadly weapons.

The defendant argues the evidence was insufficient because the State failed to prove his motive for shooting the victim. Motive is not an element of the crime; therefore, the State is not required to prove the defendant's motive for committing the crime. *See State v. Dwight Richeson*, No. 03C01-9209-CR-324, 1993 WL 188049, at *2 (Tenn. Crim. App. June 2, 1993) (holding that the State is not required to prove motive if it is not an element of the crime). Additionally, as the Tennessee Supreme Court has held, "[c]ircumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Hawkins*, 406 S.W.3d 121, 131 (Tenn. 2013) (citing *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012); *Dorantes*, 331 S.W.3d at 379-81). Here, the victim testified the defendant and co-defendant confronted him while entering a barbershop. The co-defendant then stated "B****, you're about to die," and both men immediately shot the victim. The victim was shot fourteen times. When questioned by investigators, the victim repeatedly identified the shooters without hesitation. Viewed in the light most favorable to the State, a reasonable juror could have found the defendant guilty of attempted first-degree murder and aggravated assault beyond a reasonable doubt. Accordingly, the defendant is not entitled to relief.

The defendant further argues the evidence is insufficient because the testimony of his alibi witness, his mother, was uncontested. We disagree. The State presented evidence from the victim who positively identified the defendant as one of the assailants present at the scene on December 10, implicitly rebutting Ms. Lee's testimony. Consequently, the jury chose not to accredit her testimony and resolved all conflicts in

favor of the State. *See Bland*, 958 S.W.2d at 659. This inference is supported by Ms. Lee's concession that the defendant was not present with her during the entire day. The defendant, therefore, is not entitled to relief.

Finally, we detect some errors in the entry of the judgment forms in this case. The trial court noted in the title and the "Special Conditions" box of the attempted first degree murder judgment form that the defendant's aggravated assault conviction, count two, was merging with the attempted first degree murder conviction, count one; however, the trial court did not enter a separate judgment form for the aggravated assault conviction, as required by the Tennessee Supreme Court. *See State v. Berry*, 503 S.W.3d 360, 364 (Tenn. 2015) ("[W]hen two jury verdicts are merged into a single conviction, the trial court should complete a uniform judgment document for each count."). Therefore, we must remand the case to the trial court for entry of a separate judgment form showing the entry of merger as to the specified count. *See State v. Moriarco Montrell Lee*, No. W2016-01391-CCA-R3-CD, 2017 WL 1380016, at *5 (Tenn. Crim. App. Apr. 13, 2017)

## *Conclusion*

Based upon the foregoing authorities and reasoning, we affirm the judgments of the trial court but remand the case for entry of a corrected judgment as specified in this opinion.

_____
J. ROSS DYER, JUDGE